IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLORIA LEWIS,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>A.R.E.B.A.-CASRIEL, INC. d/b/a ADDICTION CARE INTERVENTIONS, and STEVEN YOHAY, individually,<br><br>　　　　　　Defendants. | No. 1-21-cv-4861<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**NATURE OF THE ACTION**

1.　Plaintiff Gloria Lewis brings this action against pursuant to the anti-retaliation provisions of the federal False Claims Act ("FCA") codified at 31 U.S.C. § 3730(h), as well as the anti-retaliation provision of the New York False Claims Act, N.Y. State Fin. Law § 191, because Defendants terminated her employment in order to interfere with, or to retaliate for, for her efforts to report and halt their Medicaid fraud.

2.　Ms. Lewis also seeks relief pursuant to New York Labor Law §§ 740 and 741, because Defendants retaliated against her, as an employee who performed health care services, because she reported or objected to various activities, policies, and practices that Ms. Lewis reasonably believed – and that did – constitute improper quality of patient care, as well as a substantial and specific danger to the public health or safety, or health care fraud.

**JURISDICTION AND VENUE**

3.　This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it involves questions of federal law under 31 U.S.C. § 3730(h).

1

4. This Court has supplemental jurisdiction over Ms. Lewis' New York state claims pursuant to 28 U.S.C. § 1367 because they arise out of the same nucleus of operative facts as her federal claims.

5. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to the claims occurred in this judicial district and Defendants are subject to personal jurisdiction here.

6. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

7. Plaintiff Gloria Lewis is a resident of Brooklyn, and at all relevant times, was Defendant's "employee" as defined under all applicable federal and state laws.

8. Ms. Lewis is recognized by the State of New York's Office of Addiction Services and Supports ("OASAS" – formerly known as the Office of Alcohol and Substance Abuse Services) as a Credentialed Alcoholism and Substance Abuse Counselor ("CASAC").

9. Defendant A.R.E.B.A.-Casriel, Inc. d/b/a Addiction Care Interventions ("ACI") is a domestic business corporation organized and existing under and by virtue of the laws of the State of New York for the purpose of providing inpatient and outpatient health care services to patients with chemical addictions, and is headquartered at 500 West 57th Street, in Manhattan.

10. At all relevant times, ACI was an "employer" as defined under all applicable federal and state laws. Additionally, at all relevant times, ACI accepted, adopted, acquiesced, and/or otherwise was bound by the actions, omissions, and conduct of its owners, officers, managers, supervisors, employees, and agents, each of whom acted within the course and scope of his or her employment with ACI.

11. Upon information and belief, Defendant Steven Yohay maintains residences at West 57 Street in Manhattan as well as in Oak Beach, New York, and at all relevant times owned ACI and retained supervisory, hiring, and firing powers over its employees, including Ms. Lewis. As such, Yohay was an officer, manager, supervisor, employee, and/or agent of ACI acting within the course and scope of his employment with ACI and had actual or ostensible authority to bind ACI to his actions and omissions.

## FACTS

12. ACI provides drug and/or alcohol addiction treatments at its inpatient and outpatient facilities. The outpatient clinic is located on 38th Street in Manhattan and services patients who visit several days a week (depending on their needs) for group or individual treatment sessions.

13. At least 80% of ACI's patients use Medicaid as their primary payment source for its services. Medicaid is a joint federal-state program that provides healthcare benefits for certain groups, primarily the poor and disabled; the federal government provides a portion of each state's Medicaid payments, but the programs are administered by the state – pursuant to specified minimum criteria for coverage and payment of claims.

14. Requests for reimbursements submitted to Medicaid qualify as "claims" under the federal FCA. *See, e.g., U.S. v. Omnicare, Inc.*, No. 15 Civ. 4179 (CM), 2021 WL 1063784, at *3 (S.D.N.Y. Mar. 19, 2021).

15. New York's FCA "is closely modeled on the federal FCA." *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014). It is therefore "appropriate to look toward federal law when interpreting the New York act." *State ex rel. Seiden v. Utica First Ins. Co.*, 96 A.D.3d 67, 71, (1st Dep't 2012).

16. While in treatment, ACI patients must receive medical assessments from a nurse practitioner or medical doctor; and at the recommendation of their assigned counselor they will also be seen by a staff psychiatrist.

17. The billing requirements for all such services are outlined by OASAS, specifically its Ambulatory Patient Group ("APG") guidelines; these guidelines must be followed for all services that are billed to Medicaid.

18. For all patient services, the APG guidelines outline how long each service must last, who can provide the service, how many people can participate in the service, and the documentation requirements for each service. For a service to be eligible for Medicaid reimbursement, it must5 meet all applicable APG requirements.

19. Ms. Lewis began working at ACI on about August 1, 2018 as its Director of Outpatient Services, with an annual salary of $120,000.00 plus benefits.

20. Ms. Lewis soon noticed various improper and even illegal practices occurring at ACI's outpatient facility.

21. First, she observed that the facility's janitor would occasionally purport to provide counseling advice to patients, and that on at least one occasion he inappropriately sat in on a patient group session. Ms. Lewis reported this to one or more of ACI's executives, but upon information and belief, nothing was done to punish the janitor.

22. More importantly, Ms. Lewis noticed that many members of the outpatient staff essentially came and went as they pleased, failing to arrive at work promptly or to keep regular hours.

23. Ms. Lewis began to enforce the facility's time and attendance rules more strictly. She gave verbal warnings to numerous staff members – and ultimately issued six written warnings

to particularly unrepentant workers – each of whom ultimately quit or was fired.

24. Once multiple employees quit or were fired, the outpatient facility was understaffed. Because she is a CASAC, Ms. Lewis was qualified to, and did, help the remaining staff by conducting counseling sessions herself. Ms. Lewis was thus directly performing health care services, and she continued to do so until she was terminated.

25. Ms. Lewis also noticed serious concerns with the services provided at ACI and how they were reported and billed.

26. Most notably, group treatment sessions could contain (i.e., Medicaid would reimburse ACI for) up to fifteen patients per counselor. When Ms. Lewis started working at ACI, such sessions typically ran at only a portion of their full capacity, but (she learned) counselors would then falsify additional patient names on the attendance records to fill additional slots in each therapy session. ACI would then bill Medicaid for patients who had not attended a session, instead of the actual number of patients in attendance. Ms. Lewis ended that practice and insisted that only patients in attendance be recorded and reimbursed.

27. Further, at least one of the employees who ran therapy groups was not fully qualified by OASAS to do so; in particular, one employee was a CASAC trainee, and was only supposed to run therapy groups with fully certified CASAC sitting in and observing his work. But that did not happen; the trainee instead ran sessions alone, and ACI then impermissibly billed Medicaid for those sessions as though a qualified CASAC had been in attendance. Ms. Lewis also put a stop to this practice.

28. Additionally, ACI staff psychiatrist Alejo Parellada regularly wrote drug prescriptions for patients who were known to be selling or mishandling their controlled

prescription medications (like benzodiazepines).  Ms. Lewis met with Dr. Paralleda and advised him to cease this practice – but he did not.

29.     Additionally, when billing Medicaid for individual psychiatric services, ACI was required by OASAS to submit contemporaneous notes written by the psychiatrist who conducted the treatment (i.e., Dr. Parellada).  But ACI often submitted notes written after-the-fact by his office assistant or billing clerk, who had no firsthand knowledge of what treatments had been provided; ACI falsely submitted such notes as the psychiatrist's own contemporaneous notes.

30.     Dr. Parellada also indicated that he had some sort of personal relationship with a laboratory (Tenet Diagnostics) that ACI used for drug testing, which was apparently a conflict of interest not allowed under OASAS rules.  When Ms. Lewis realized this, she terminated ACI's use of that laboratory, and looked into finding a different testing laboratory.

31.     Further, ACI patients frequently failed to take urine tests, or ACI's staff failed to personally supervise such tests – as was required for ACI to bill Medicaid for certain medications or treatment.  But ACI billed Medicaid for the treatments anyway, misleadingly claiming that the urine tests had been properly performed.

32.     Ms. Lewis verbally reported all these incidents to Ms. Lewis reported these issues to ACI's Chief Programming Officer, Chris Alcazar (who was her immediate supervisor) and to ACI's Chief Executive Officer, Don Gasparini in or around the fall of 2018, February 2019, March 2019, and April 2019.  Gasparini and Alcazar apparently met with Dr. Paralleda thereafter and insisted that he cease having his staff ghost-write his treatment notes.

33.     Sometime between February and April 2019 Ms. Lewis, suggested to Gasparani and Alcazar that they should contact OASAS to report these various issues.

6

34. Alcazar and Gasparini told Ms. Lewis that they did not want to report the incidents to OASAS, but would "handle things" themselves (they did not say how).

35. In about March 2019, Yohay walked unannounced into Ms. Lewis' office one day, and told her that the number of services that ACI was billing needed to increase.

36. In response, Ms. Lewis noted that she had been working to correct ACI's various shoddy practices and suspect billing, particularly how she had ended the practice of reporting and billing Medicaid for patients who had not actually attended therapy sessions as billed. That, she explained, was presumably one reason why the amount of services billed to Medicaid had declined. Yohay responded: "well, we need to get these numbers up"; he indicated that he did not want to hear anything further about any health care fraud issues.

37. Ms. Lewis did not cease insisting that ACI staff follow OASAS rules and procedures, and she continued prohibiting unqualified staff from conducting therapy sessions, ghost-writing psychiatrist notes, or prescribing medications without following proper urine testing protocols.

38. Yohay terminated Ms. Lewis on June 3, 2019, apparently because she refused to allow ACI staff to resume improper patient care and Medicaid billing practices. Although Defendants may claim that Ms. Lewis was fired for poor performance, she had never been disciplined or reprimanded. Nor, aside from Yohay telling Ms. Lewis to "get those numbers up," had she ever received any negative reviews of her performance.

39. Upon information and belief, upon taking Ms. Lewis' job, her replacement (a man named Thomas Perry) instituted or resumed various improper practices, such as asking counselors to write notes for therapy sessions that had not actually occurred, and having a non-CASAC run group therapy sessions.

40. Upon information and belief, after terminating Ms. Lewis, either Yohay or Perry reinstated ACI's contract with Tenet Diagnostics.

41. Several weeks after her termination, Ms. Lewis called OASAS to report various illegal and unethical practices that ACI was engaged in, and was advised to submit a form documenting the various misconduct she had witnessed. She did so within another few weeks.

42. Ms. Lewis also called the DEA to report drugs being distributed improperly. In about October 2019, DEA agents contacted Ms. Lewis and asked to meet with her to discuss her allegations and take her statement, and they did so the following month. The DEA seemed to be interested in investigating the ghost-writing of psychiatrist notes, patients being seen or given prescriptions despite not being enrolled in any ACI program, and patients being prescribed medications without proper urine tests.

43. Ms. Lewis also learned that the Bronx Defenders Office ("BDO") had cut ties with the ACI outpatient program due to at least one patient's complaints that he had paid for services that were never provided.

44. On December 17, 2020, this Court unsealed a *qui tam* complaint alleging that ACI and Yohay also violated the federal False Claims Act (as well as the federal Anti-Kickback Statute) with regard to their inpatient treatment program, by "induc[ing] Medicaid beneficiaries to be admitted to ACI's inpatient treatment program by employing drivers who were compensated based in part on the volume of patients they recruited for admission into the program" and by "provid[ing] potential new patients with money, drugs, and/or alcohol." (*See* No. 1:16-cv-01760-VSB, Docket 1, ¶¶ 1-3, 27-35.)

45. The *qui tam* complaint also alleges that ACI and Yohay admitted patients without proper evaluations by qualified health professionals as required, and that they had unqualified staff

members conduct patient assessments and complete admissions forms – which were then used to support Medicaid reimbursement claims – by using photocopies of a physician's signature.  (*Id.*, ¶¶ 5, 50-54.)

46. Several days later, the United States Attorney's Office for the Southern District of New York announced that Defendants had settled the claims against them for $6 million.  As part of the settlement, Yohay agreed to be excluded from participating in Medicaid or other federal healthcare programs for fifteen years, and to divest his ownership of ACI.[1]

**COUNT I**:  **Federal False Claims Act – Retaliation (Not Against the Individual Defendant)**

47. Plaintiff incorporates by reference each allegation made in the above paragraphs of this Complaint as if fully set forth herein.

48. The False Claims Act subsection titled "Relief From Retaliatory Actions" states in pertinent part that "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter."  31 U.S.C. § 3730(h).

49. At all relevant times, Ms. Lewis' reports and complaints about Defendants' Medicaid fraud were protected under the above provision.

50. Defendants discharged Ms. Lewis from employment in violation of the above provision because she engaged in the lawful acts of reporting or attempting to stop Defendants' Medicaid fraud.

---

[1] https://www.justice.gov/usao-sdny/pr/acting-manhattan-us-attorney-announces-settlement-substance-abuse-treatment-center-and.

9

51.     Specifically, Ms. Lewis disclosed to her supervisors evidence that false or fraudulent Medicaid claims were being submitted to the federal government, and she urged them to disclose and/or cease that practice.

52.     Ms. Lewis will rely on a broad array of evidence to demonstrate a causal link between this protected activity and the adverse actions taken against her, such as the temporal proximity between her complaints and her discharge, and Yohay's demeanor and comments toward Ms. Lewis regarding her protected activity.

53.     As a direct result of ACI's unlawful retaliation, Ms. Lewis has suffered damages that include but are not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other tangible and intangible harms.

54.     Pursuant to 31 U.S.C. § 3730(h)(2), Ms. Lewis accordingly seeks relief that includes reinstatement with the same seniority status that she would have had but for the retaliatory termination, twice the amount of her back pay, interest on her back pay, and compensation for any special damages she has sustained, including litigation costs and reasonable attorneys' fees.

**Count II: New York False Claims Act – Retaliation (Not Against the Individual Defendant)**

55.     Plaintiff incorporates by reference each allegation made in the above paragraphs of this Complaint as if fully set forth herein.

56.     Section 191 of the New York False Claims Act prohibits an employer from taking retaliatory action against an employee because such employee engages in protected activity under the Act.

57.     At all relevant times, Ms. Lewis was a health care employee protected under the New York False Claims Act antiretaliation provision.

58. Ms. Lewis disclosed to her supervisors and asked them to disclose to OASAS, a New York government entity, evidence that she reasonably believed showed false or fraudulent claims to the state government, including the state's Medicaid agency, for payment or approval.

59. Ms. Lewis' complaints about, and attempts to prevent, ACI's fraudulent Medicaid billing practices constituted protected activities under the New York False Claims Act.

60. Ms. Lewis's June 3, 2019 termination constituted an adverse personnel action under the New York False Claims Act's anti-retaliation provision.

61. ACI would not have terminated Ms. Lewis's employment but for her protected activity.

62. Ms. Lewis will rely on a broad array of evidence to demonstrate a causal link between this protected activity and the adverse actions taken against her, such as the temporal proximity between her complaints and her discharge, and Yohay's demeanor and comments toward Ms. Lewis regarding her protected activity.

63. As a direct result of ACI's unlawful retaliation, Ms. Lewis has suffered damages that include but are not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other tangible and intangible harms.

64. Ms. Lewis seeks reinstatement with the same seniority status that she would have had but for the discrimination, a permanent injunction restraining and prohibiting any future acts of retaliation by Defendants, payment of two times the amount of back pay she is owed, interest on such back pay, and compensation for any special damages she has sustained, including litigation costs and reasonable attorneys' fees.

**Count III:  New York Labor Law § 740 – Whistleblower Retaliation**

65. Plaintiff incorporates by reference each allegation made in the above paragraphs of this Complaint as if fully set forth herein.

66. N.Y.L.L § 740(2) states in part that an employer "shall not take any retaliatory personnel action against an employee" because such employee "(a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud," or because such employee "(c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation."

67. Ms. Lewis disclosed to her supervisors, objected to, and refused to participate in ACI practices that violated laws, rules, or regulations, and that presented a specific danger to public health or safety, and that constituted health care fraud.

68. Among other things, Ms. Lewis reported and refused to participate in fraudulently inflating the number of patients attending group therapy sessions that were billed to Medicaid, prescribing medications to patients without properly administered urine tests, and billing Medicaid for psychiatric treatment sessions for which the psychiatrist's notes had been ghost-written after the fact by his non-medical staff.

69. Ms. Lewis's June 3, 2019 termination constituted a retaliatory personnel action, and Defendants would not have terminated Ms. Lewis's employment but for her protected activity.

70. Ms. Lewis will rely on a broad array of evidence to demonstrate a causal link between this protected activity and the adverse actions taken against her, such as the temporal proximity between her complaints and her discharge, and Yohay's demeanor and comments

toward Ms. Lewis regarding her protected activity.

71. As a direct result of Defendants' unlawful retaliation, Ms. Lewis has suffered damages that include but are not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other tangible and intangible harms.

72. Ms. Lewis seeks reinstatement to the same position she held before her retaliatory termination or an equivalent position, with full seniority and benefits; compensation for her lost wages, benefits, and other remuneration; and reimbursement of her reasonable costs, disbursements, and attorneys' fees.

### Count IV:  New York Labor Law § 741 – Whistleblower Retaliation

73. Plaintiff incorporates by reference each allegation made in the above paragraphs of this Complaint as if fully set forth herein.

74. N.Y.L.L § 741(2) prohibits an employer from taking retaliatory action against an employee (defined as a person "who performs health care services for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration") because the employee "(a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care"; or "(b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."

75. During her employment with ACI, Ms. Lewis performed health care services for ACI, specifically by conducting group therapy sessions in her capacity as a CASAC; she was thus an employee protected under N.Y.L.L § 741, and ACI was an employer subject to the law.

76. During her employment, Ms. Lewis disclosed to her supervisors, or objected to and refused to participate in various practices constituting improper quality of patient care, including but not limited to:

   a. Unqualified employees (like CASAC trainees) running therapy groups alone;

   b. A staff psychiatrist writing drug prescriptions for patients known to be selling or mishandling their controlled prescription medications (like benzodiazepines);

   c. The staff psychiatrist's office assistant or billing clerk, without firsthand knowledge of what treatments had been provided, writing the psychiatrist's treatment notes; and

   d. patients failing to take supervised urine tests prior to receiving controlled medications.

77. Ms. Lewis's June 3, 2019 termination was a direct result of her complaining about and refusing to participate in the above activities, and thus constituted a retaliatory action under N.Y.L.L § 741.

78. Ms. Lewis will rely on a broad array of evidence to demonstrate a causal link between this protected activity and the adverse actions taken against her, such as the temporal proximity between her complaints and her discharge, and Yohay's demeanor and comments toward Ms. Lewis regarding her protected activity.

79. As a direct result of Defendants' unlawful retaliation, Ms. Lewis has suffered damages that include but are not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other tangible and intangible harms.

80. Ms. Lewis seeks reinstatement to the same position she held before her retaliatory termination or an equivalent position, with full seniority and benefits; compensation for her lost

wages, benefits, and other remuneration; and reimbursement of her reasonable costs, disbursements, and attorneys' fees.

**WHEREFORE** Plaintiff demands judgment against Defendants for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and declaration that Defendant's conduct as set forth herein is in violation of the federal and state False Claims Act as well as N.Y.L.L §§ 740 and/or 741.

**JURY DEMAND:**  Plaintiff demands a trial by jury on all issues raised by this complaint.

Dated:  New York, New York
         June 1, 2021

                              **DEREK SMITH LAW GROUP, PLLC**

By:    _/s/ Daniel S. Kirschbaum_
       Daniel S. Kirschbaum, Esq.
       1 Penn Plaza, Suite 4905
       New York, New York 10119
       (212) 587-0760
       dsk@dereksmithlaw.com

       *Attorneys for Plaintiff*